IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ADAM PAUL ROBERSON,

    **Plaintiff,**

    v.                                                                                                                           CASE NO. 23-3205-JWL

NATHANIEL CHILES, et al.,

    **Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983. Plaintiff is incarcerated at the El Dorado Correctional Facility in El Dorado, Kansas ("EDCF"). The Court granted Plaintiff leave to proceed in forma pauperis. On September 12, 2023, the Court entered a Memorandum and Order (Doc. 4) ("M&O"), finding that the proper processing of Plaintiff's claims cannot be achieved without additional information from appropriate KDOC officials. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991). Accordingly, the Court ordered the KDOC officials to prepare and file a *Martinez* Report. The M&O provided that "[o]nce the Report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 4, at 6.) After the *Martinez* Report (Docs. 9, 10) (the "Report") was filed, the Court screened Plaintiff's claims and entered a Memorandum and Order to show Cause (Doc. 14) ("MOSC") directing Plaintiff to show good cause why his claims should not be dismissed. This matter is before the Court on Plaintiff's response (Docs. 15, 16.)

**I. Nature of the Matter before the Court**

Plaintiff alleges that on October 5, 2022, he was in B2 cellhouse and was told to exit his cell in handcuffs. Plaintiff refused and then slipped the cuffs from behind his back to his front

1

by stepping through them.  A code for assistance was called by Sgt. Chastain and multiple officers arrived.  Plaintiff alleges that by the time Officer Chiles arrived, Plaintiff's cuffs were already back behind his back.  Plaintiff alleges that as he was escorted from his cell to the shower, Officer Chiles bent Plaintiff's right pinky finger to the side until it audibly popped, causing the tendon to rip from the bone and causing "instantaneous horrible pain."  (Doc. 1, at 3.)

Plaintiff alleges that since that night, he has experienced horrible pain and his finger has curled up into a hook shape.  Plaintiff alleges that he put in medical request forms and a couple of months later the providers put in a request for Plaintiff to see a specialist in Wichita, Kansas.  On April 4, 2023—six months after the injury—Plaintiff was taken to a hand specialist in Wichita where he was told that the tendon had been ripped from the bone.  The doctor put Plaintiff's finger in a cast that was supposed to be changed once a week for six weeks, followed by rehabilitation therapy.

Plaintiff alleges that he was never taken back to the doctor and was told by Centurion medical staff that he did not have an appointment scheduled.  Plaintiff alleges that as of August 2023, no one had removed his cast.  Plaintiff saw Nurse Practitioner Kelly Knipp and she told Plaintiff that she put in an order to have the cast removed weeks ago, and that she did not know why it hadn't been done.  She also told Plaintiff he was approved for rehab therapy.

Plaintiff had his first rehab therapy on July 27, 2023, by a specialist that came to the facility. Plaintiff alleges that out of six scheduled sessions, he has only had two actual rehab appointments. The specialist told Plaintiff that he may have irreversible and permanent deformation and pain due to the severity of his injury and the six-month delay in getting it diagnosed and casted.

Plaintiff alleges cruel and unusual punishment and deliberate indifference. Plaintiff names as defendants: Correctional Officer Nathaniel Chiles; Centurion; and Nurse Practitioner Kelly Knipp. Plaintiff seeks $80,000 in monetary damages.

## II. The Report

### A. Use of Force

The Report includes a Use of Force Report, an Incident Report, and various Narrative Reports by witnesses, all relating to the October 5, 2022 incident. The Use of Force Report, completed by SST CO1 Singley, states that an "officer needs assistance" was called due to Plaintiff "breaking escort and slipping restraints . . . [he] was able to place his restraints to the front of his body." (Doc. 9, at 3, Exhibit B). The report provides that while escorting Plaintiff to the shower "he began to turn his body to spit on us, he then attempted to stop and talk to another cell while we where (*sic*) walking." *Id*. Officer Singley applied pressure to Plaintiff's arms and forced him to keep walking, at which point Officer Chiles also began to apply pressure to Plaintiff's body to force him to keep walking. *Id*. The Use of Force Report further provides that:

> When we arrived at the shower, I told the offender to step in, however he was hesitant. I then placed my hand on the offenders' (*sic*) arms and forced him into the shower. After the offender was in the shower and the shower door was secured, I ordered him to place his hands out of the food pass so that we could remove the restraints, offender Roberson refused this order. At that time, SST CO1 Chiles, N. grabbed ahold of the restraint, and we then began to perform a three man unrestraint after the restraints where (*sic*) removed. I attempted to secure the food pass, however the offender continued to batter us by spitting on us. Once the food pass was secured, the offender continued to spit on us. I then deployed a short burst of 1.3% OC stream in the offender (*sic*) face to stop him from continuing to batter us.[1]

*Id*.

---

[1] Plaintiff does not make a claim in his Complaint regarding the use of OC, and he does not name SST CO1 Singley as a defendant.

The Incident Report, prepared by Officer Chastain, describes Plaintiff refusing to comply with directives to exit his cell and then sitting on his bunk and moving his restraints under his legs and slipping them to the front of his body. *Id*. at 3, Exhibit C. Plaintiff was then escorted to the shower, attempts were made to remove his restraints, Plaintiff began spitting repeatedly on officers at which time Singley deployed his OC spray, and then Plaintiff took a decontamination shower but refused a medical assessment by CHS Tharp. *Id*. Plaintiff was also assessed by CHS Tague for mental health. *Id*.

Officer Schievelbein's Narrative Report indicates that Plaintiff was provided with a decontamination shower, was escorted from the shower to the B2 strip out cage so medical could assess him, was then escorted to C cellhouse where mental health came to assess him, and he was placed on a crisis level II. *Id*. at 3–4, Exhibit E. Officer Buchman's Narrative Report provides that he walked away as the OC spray was deployed, but later returned to move Plaintiff to a "strip out" cage. *Id*. at 4, Exhibit F. A "spit net" was placed on Plaintiff and he was medically assessed by Nurse Tharpe at which time he became verbally aggressive and "[d]ue to his behavior he was not fully assessed." *Id*. The other Narrative Reports contain similar accounts of the incident. *See* Exhibits D, G, H, I, and J.

Officer Chiles' Narrative Report states that when he arrived, numerous other officers were present, and Plaintiff was sitting on the bottom bunk threatening and screaming at officers. Doc. 9, at 5, Exhibit K. Plaintiff had moved his restraints to the front of his body. As Chiles and other officers attempted to transport Plaintiff to the shower, Plaintiff attempted to break escort and began screaming into a cell. *Id*. In response, Chiles grabbed Plaintiff's right wrist and wrist restraint to prevent him from moving his arms "due to the fact that he had slipped his restraints to the front of his body." *Id*. Plaintiff was ordered to face forward and to stop attempting to break

4

escort.  *Id*.  Plaintiff was given multiple directives to stop spitting and to put his hands in the food pass so that his restraints could be removed, but instead he continued to spit on officers.  As Plaintiff attempted to pull away, Chiles grabbed Plaintiff's right wrist and right-hand fingers and leaned his body weight back to prevent Plaintiff from pulling the restraints away from him and was finally able to remove the restraints.  *Id*.  Plaintiff again spit on Chiles and other officers at the door at which time Singley deployed his OC spray.  *Id*.  Chiles later assisted in escorting Plaintiff to a "strip out" cage.  Plaintiff attempted to turn around and yell at Chiles, and Chiles grabbed his left arm to prevent him from turning towards him.  *Id*.

Chiles states in his affidavit that at no time did he hear Plaintiff's finger audibly pop, Plaintiff did not complain of a finger injury or complain about any pain during Chiles' contact with Plaintiff on October 5, 2022, and any force used was reasonable and necessary to perform his job duties.  *Id*. at 6, Exhibit L.  The Report provides that "[t]en officers completed various types of detailed reports regarding [Plaintiff's] transport from his cell to the shower on October 5, 2022, and none described Chiles bending [Plaintiff's] pinky, hearing an audible pop of [Plaintiff's] pinky or [Plaintiff] complaining of 'instantaneous horrible pain.'"  *Id*. at 6.

Chiles and Singley also completed Incident Reports related to staff battery based on Plaintiff spitting on them.  *Id*. at 6, Exhibit M.  Department injury forms and bloodborne pathogen forms were also executed.  *Id*.  Based on his conduct on October 5, 2022, Plaintiff received three disciplinary referrals totaling five charges, including two charges for disobeying orders, two battery charges, and interference with restraints.  *Id*. at 6, Exhibit N.  Plaintiff pleaded guilty to all five charges.  *Id*. at 7, Exhibits N, O, and P.

**B.  Medical Care**

The Report provides that:

5

On October 5, 2022, immediately following the use of force, attempts were made to assess Roberson. Roberson was placed on crisis level 2 by the on-call psychiatric provider but he refused a post use of force assessment. (Exhibit S at 1-5) On October 7, 2022, during a nurse visit, Roberson complained about right hand pinky finger pain and an x-ray of his right hand was ordered. (*Id*. at 6-9) Contrary to Plaintiff's claims of "instantaneous horrible pain", medical records document his statement that "it wasn't until he cooled down he began to notice his right pinky finger starting to hurt". (*Id.* at 9) The x-ray was conducted on October 10, 2022 and showed no fracture of the right hand. (*Id*. at 10-11) On October 17, 2022 Roberson requested the results of his x-ray, which were provided to him in writing. (*Id.* at 12-14) On October 31, 2022 Roberson was seen and an outpatient request was submitted to allow him to be seen by a hand surgeon. (*Id*. at 15-19) Roberson refused his annual physical on November 9, 2022. (*Id*. at 20) Roberson then injures his left hand in a fight on November 15, 2022. (*Id.* at 21-34) Roberson refuses chronic care treatment on December 21, 2022. (*Id.* at 35) On December 28, 2022 he sees a facility nurse for several issues and inquires about his hand appointment. (*Id*. at 36-37)

On January 7, 2023 Roberson sought medical care and described smoking meth and falling off the top bunk and complains of pain in his right knee, left foot and right hand pinky finger. (*Id*. at 38-42)[2] Roberson refuses to take the pain medication as prescribed, threatens self-harm if he's not sent out for evaluation. (*Id*. at 41) An assessment of Roberson noted full range of motion to bilateral hands. (*Id*. at 51) Arrangements are made to transport Roberson to Susan B. Allen hospital, however, Roberson then refused to be transported. *(Id.* at 47, 50-51) Roberson refuses to have his vitals taken and is describe[d] as fighting officers and spitting on a nurse. (*Id*. at 43) He again refuses to have his vitals measured on January 8, 2023. (*Id*. at 54)

On April 4, 2023, Roberson was transported to AMG Via Christi, Founders, Orthopedics in Wichita, Kansas for evaluation. Dr. Joshua Linnell (Linnell) treated Roberson. (Exhibit T) Linnell noted a right small finger boutonniere deformity and recommended serial casting of the finger towards full extension for six weeks with therapy. (*Id.* at 3) Linnell took another x-ray and noted no acute or healing fracture, no osseous erosions, no abnormal soft tissue mineralization, and that alignment was normal. (*Id*.at 4)

An overview, symptoms and causes, diagnosis and treatment of a boutonniere deformity are discussed https://my.clevelandclinic.org/health/diseases/22094-boutonniere-

---

[2] The Court notes that Plaintiff's report that he was smoking meth at the time is set forth on page 50 of Exhibit S.

> deformity.
>
> On April 26, 2023 Roberson notified facility nursing that his cast kept coming off. (*Id.* at 58-60)[3] Utilization management notes document that Roberson was originally to have serial casting, however, his finger was able to be cast in full extension when the original cast was placed. *(Id.* at 61) Follow up appointments are made with Dr. Linnell for May 16, 2023 and May 17, 2023 but are cancelled due to security staffing issues and the inability to transport Roberson to Linnell's office in Wichita. (*Id.* at 65) Facility nursing is advised the cast can be removed at the facility, that Roberson needed to start working on range of movement, recommended physical therapy and stated a follow up appointment might not be necessary. (*Id.* at 66)
>
> ### *PHYSICAL THERAPY*
>
> On June 22, 2023 Roberson was approved by Dr. Ballard for six sessions of physical therapy noting physical therapy was medically appropriate for Roberson to improve range of movement in finger. (*Id.* at 68) Roberson first met with physical therapist Andy Clifford (Clifford) on July 27, 2023. (*Id.* at 69) Roberson was educated on range of movement exercises and provided an exercise handout. *(Id.)* Linnell's records indicate Roberson is left-handed. (*Id*.) Roberson next attended physical therapy on August 3, 2023 and Clifford noted good improvement with range of motion. Roberson attended physical therapy again on September 7, 2023. (*Id.* at 72) His next session on September 28, 2023 indicated Roberson had been able to maintain his range of movement. *(Id.* at 73) He attended physical therapy o[n] October 26, 2023 and records indicated a loss of extension since his September 28, 2023 appointment. (*Id.* at 75) Roberson was discharged after his November 9, 2023 physical therapy appointment. (*Id.* at 77)

(Doc. 9, at 7–9.)

### III. DISCUSSION

#### A. Excessive Force

The use of excessive force is prohibited under the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (stating that "claims of excessive force involving convicted prisoners arise under the

---

[3] The cited page numbers are located in Exhibit S.

Eighth Amendment"). The Eighth Amendment's prohibition against "cruel and unusual punishments" applies to the treatment of inmates by prison officials. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986). Prison officials violate inmates' Eighth Amendment rights when they subject them to the "unnecessary and wanton infliction of pain." *Id*. at 319. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id*. at 9–10.

Plaintiff acknowledges in his Complaint that when he was told to exit his cell in handcuffs, he refused and then slipped the cuffs from behind his back to his front by stepping through them. A code for assistance was called by Sgt. Chastain and multiple officers arrived. Plaintiff alleges that by the time Officer Chiles arrived, Plaintiff's cuffs were already back behind his back. Videos capturing a portion of the transport from Plaintiff's cell to the shower were included in Exhibit V to the Report. Despite Plaintiff's allegation that by the time Chiles arrived his handcuffs were back behind his back, the video shows Plaintiff's hands in front of his body during the transport to the shower. Although the view from the videos does not show whether or not Plaintiff's pinky finger was bent during the transport, it does show Plaintiff spitting on the officers. Plaintiff pleaded guilty to five charges stemming from the incident, including two charges for disobeying orders, two battery charges, and interference with restraints.

Plaintiff argues in his response that he did not start spitting on officers until he was in the shower and after his finger was injured. (Doc. 15, at 2.) However, he acknowledges in his response that his hands were still cuffed in front of him during the transport, as opposed to his earlier statement that they had already been put back behind him. *See* Doc. 16, at 1 ("I Adam Roberson after reviewing exhibit V do amend my initial recollection of handcuffs being placed behind my back prior to exiting my cell.") Plaintiff also argues that other inmates have been abused in the facility (Doc. 15, at 3) and attaches an affidavit from another inmate. (Doc. 16–1.) The affidavit references two different incidents involving a different inmate and a different officer that is not named as a defendant in this case. Plaintiff also argues that there are discrepancies in the Report. (Doc. 15, at 4–6.)

It appears that any force used during Plaintiff's transport to the shower was necessary due to Plaintiff's non-compliant actions toward staff and failure to follow orders. Any force used was so uneventful that it was not mentioned in the reports of ten KDOC officers who wrote reports related to Singley's OC spray use of force. Plaintiff has not shown that Chiles acted maliciously and sadistically to cause harm, but rather force was applied in a good-faith effort to maintain or restore discipline. Plaintiff has failed to state a claim of excessive force.

### B. Medical Care

The Eighth Amendment guarantees a prisoner the right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

The "deliberate indifference" standard includes both an objective and a subjective component. *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005) (citation omitted). In the

objective analysis, the deprivation must be "sufficiently serious," and the inmate must show the presence of a "serious medical need," that is "a serious illness or injury." *Estelle*, 429 U.S. at 104, 105; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), *Martinez*, 430 F.3d at 1304 (citation omitted). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Martinez*, 430 F.3d at 1304 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Id*. (quoting *Sealock*, 218 F.3d at 1209). In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (quoting *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996)).

Delay in providing medical care does not violate the Eighth Amendment, unless there has been deliberate indifference resulting in substantial harm. *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993). In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted). "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle*, 429 U.S. at 106–07; *see also Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968)

(prisoner's right is to medical care—not to type or scope of medical care he desires and difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983).

Plaintiff must also satisfy the subjective prong. The Supreme Court has insisted upon actual knowledge: "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added). An apparent disagreement over course of treatment, however, does not rise to the level of a constitutional violation. *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010). "A plaintiff 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate,' but rather that the official 'merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8).

The Tenth Circuit recently clarified that "it is possible to have some medical care and still state a claim under the gatekeeper theory." *Id*. at 1139. "The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Id*. (citations omitted). Under the deliberate indifference analysis, "merely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability." *Id*. "Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances." *Id*. (citations omitted).

11

Plaintiff's allegations show that he received medical care that was more than the functional equivalent of a compete denial of care. The Report supports this conclusion regarding Plaintiff's medical care at EDCF. Although Plaintiff was only assessed by mental health staff immediately following the incident, when he complained of his finger injury a couple of days later an x-ray was ordered and showed no fracture. The Report shows that Plaintiff's own behavior frustrated attempts to provide him with medical care and his actions potentially aggravated any injury he received during the incident. Although serial casting of his finger was originally recommended, Plaintiff's finger was able to be in a cast fully extended during the original casting, making serial casting unnecessary. After casting, Plaintiff was educated on range of movement exercises and attended six physical therapy appointments.

In his response, Plaintiff claims that he did not refuse medical treatment immediately following the incident, but rather Nurse Tharp refused to see him. (Doc. 15, at 1.) As support, Plaintiff refers to the section of the use of force report stating that "[h]e was refused medical treatment due to him battering staff and his state of combativeness" and "[d]ue to offender being combative, he was refused medical assessment due to us not wanting to put medical staff's safety at risk." (Doc. 15–1, at 5.) Plaintiff argues that this is an admission that he was refused medical treatment. *Id.* However, Plaintiff does not deny that he was combative and he was refused assessment to protect staff. Plaintiff has also failed to deny his statement to medical staff that it wasn't until he cooled off that he realized his finger was injured.

Plaintiff also argues that the Report states that he had full range of movement regarding his pinky finger, "so why send [him] to outside facility doctors where [he] was put into a cast, then approved for rehabilitation of [his] finger. (Doc. 15, at 2.) Plaintiff points to the reference

in the Report to his January 7, 2023 medical records noting "full range of motion to bilateral hands" and states "why recommend me to a hand surgeon then?" (Doc. 15–1, at 30.)

Plaintiff also argues that when he was seen by medical on January 7, 2023, his statement to medical that he was on meth when he re-injured his pinky finger was in response to staff's questions regarding where he was hurt and involved a separate incident than the original injury that forms the basis for this case. (Doc. 16, at 1.) He claims it has no bearing on this case because it happened three months after the original injury and involved a separate incident. *Id*. However, it was mentioned in the Report, along with other conduct by Plaintiff, to show that his own behavior frustrated attempts to provide him with medical care and his actions potentially aggravated any injury he received during the incident.

Plaintiff has failed to show that any defendant was deliberately indifferent to his medical care. Plaintiff's claims suggest negligence, at most, which is insufficient to state a constitutional violation. The "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

**IT IS THEREFORE ORDERED BY THE COURT** that this matter is **dismissed** for failure to state a claim.

**IT IS SO ORDERED**.

**Dated March 25, 2024, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**